IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FIRST AMERICAN TITLE
INSURANCE COMPANY,

    Plaintiff,

      v.

MARTIN L. SILBIGER,

    Defendant.

CIVIL ACTION FILE
NO. 1:15-CV-546-TWT

## OPINION AND ORDER

This is a declaratory judgment action.  It is before the Court on Plaintiff First American Title Insurance Co.'s Motion for Summary Judgment [Doc. 43]. For the reasons stated below, the Plaintiff's Motion for Summary Judgment [Doc. 43] is GRANTED in part and DENIED in part.

## I. Background

The Plaintiff, First American Title Insurance Company (FATIC), is a national title insurer organized under the laws of Nebraska, with its principal place of business in California.[1] The Defendant, Martin L. Silbiger, is a resident of

---

[1]    Compl. ¶ 1.

Georgia who maintains a residence at 1335 Draycott Place, Atlanta, Georgia (the "Property").[2]

In 1997, after acquiring a sufficient tract of land, Paramount Builders of Georgia, LLC (the "Builders") developed a residential subdivision known as "Draycott Place".[3] As part of the six-lot development, the Builders constructed two underground storm water retention vaults to collect storm water run-off from all of the lots in the subdivision.[4] One of these vaults (the "Vault") was located on the Property.[5] In order to obtain a building permit from the City of Atlanta to build the vaults, the Builders were required to sign an agreement (the "Indemnity Agreement") on behalf of itself and its successors in title indemnifying the City from any damages or claims arising out of the "construction, maintenance or use of" the Vault.[6] The Indemnity Agreement specified that the City of Atlanta had inspected the plans of the Vault, which were attached, and had found them to be

---

[2]     Id. ¶ 2.

[3]     Pl.'s Statement of Material Facts ¶¶ 5, 6.

[4]     Id. ¶ 9.

[5]     Id. ¶ 10.

[6]     Compl., Ex. E, at 1.

adequate.[7] The Indemnity Agreement also specified that the maintenance of the Vault was the responsibility of the Builders and their successors in title.[8] After the Indemnity Agreement was signed, it was recorded in the public records.[9]

In 2005, the Defendant purchased Lot 6 of the subdivision (the "Property").[10] At the same time he purchased the Property, the Defendant also purchased a homeowner's title insurance policy (the "Policy") from the Plaintiff.[11] The Policy provides insurance for losses sustained as a result of twenty-nine listed "Covered Risks."[12] In particular, Covered Risk No. 12 provides coverage if the homeowner is "required to correct or remove an existing violation of any covenant, condition or restriction affecting the Land, even if the covenant, condition or restriction is excepted in Schedule B."[13] Schedule B of the policy excepts from coverage, among other things, "covenants, conditions, restrictions, easements

---

[7]     Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. D, at 2.

[8]     Id.

[9]     Capeloto Aff. ¶ E-5.

[10]    Pl.'s Statement of Material Facts ¶ 18.

[11]    Id. ¶ 20.

[12]    Compl., Ex. A, at 1.

[13]    Id.

and/or servitudes," not including those which are covered under Covered Risk 12.[14] The Policy also contains a number of exclusions from coverage. Pertinent to this case, the Policy excludes risks "that first occur after the Policy date..."[15] Lastly, the Policy requires the policyholder to promptly report any claims, and specifically reserves the right to take legal action without giving up any other rights under the Policy.[16]

In February of 2014, the lid of the Vault collapsed during a period of heavy rainfall, resulting in damage to the property (the "Collapse").[17] Upon inspecting the damage, it was discovered that the Vault was not constructed in accordance with the plans that had been approved by the city and that were the basis for the Indemnity Agreement. Under the plans, the Vault was supposed to be accessible from two different manholes with accompanying ladders.[18] Because the Vault was located under several feet of earth, there were supposed to be "risers" (i.e., extensions) that brought the entrances to the surface.[19] However, these risers were

---

[14]    Id. at 2.

[15]    Id. at 3.

[16]    Id.

[17]    Pl.'s Statement of Material Facts ¶¶ 31-32.

[18]    Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. D, at 4-5.

[19]    Id.

never built.[20] As a result, the manholes were covered under several feet of earth, rendering the Vault invisible and inaccessible.[21]

The Defendant first made a claim with his homeowners insurance carrier but was denied.[22] He then demanded that the City of Atlanta pay for the repairs of the Vault, but was similarly denied.[23] The City cited the Indemnity Agreement in denying the Defendant's request, stating that the Vault is the "sole responsibility" of the owners of the Property.[24] The City, however, made no demands upon the Defendant, but did warn the Defendant of the potential consequences of inaction.[25]

The Plaintiff filed this declaratory judgment action, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a determination that the Plaintiff has no liability whatsoever toward the Defendant. The Defendant answered and filed a counterclaim, contending that the Plaintiff denied the

---

[20]     Id., Ex. A, at 4.

[21]     Id.

[22]     Pl.'s Statement of Material Facts ¶¶ 33-34.

[23]     Id. ¶¶ 35-36.

[24]     Compl., Ex. D, at 1.

[25]     Id.

Defendant's claim in bad faith, in violation of O.C.G.A. 33-4-6. The Plaintiff moves for summary judgment on all claims.

## II. Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[26] The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.[27] The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact.[28] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.[29] "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."[30]

---

[26]   FED. R. CIV. P. 56(a).

[27]   Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

[28]   Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

[29]   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

[30]   Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III. Discussion

### A. Declaratory Judgment

FATIC moves for summary judgment on two theories: (1) that the Collapse is not covered under Covered Risk No. 12 because it occurred after the policy was entered into, and (2) that it is excepted from coverage because it was the subject of a recorded covenant. Both theories turn on the interpretation of the insurance contract. "An insurance policy is simply a contract, the provisions of which should be construed as any other type of contract."[31] "Construction of the contract, at the outset, is a question of law for the court."[32] Courts in Georgia undertake a three-step process to interpreting a contract.[33] The first step is "to determine if the instrument's language is clear and unambiguous...[if it is], the court simply enforces the contract according to its terms..."[34] If there is any ambiguity, then the court moves on to the second step and applies the rules of contract construction to

---

[31] Hunnicutt v. S. Farm Bureau Ins. Co., 256 Ga. 611, 612 (1987).

[32] American Empire Surplus Lines Ins. Co. v. Hathaway Development Co., Inc., 288 Ga. 749, 750 (2011).

[33] Id.

[34] Id.

resolve it.[35] And if any ambiguity still remains, only then does the interpretation of the language get submitted to a jury.[36]

Under Schedule B of the insurance policy, damages that result by reason of a recorded covenant are explicitly exempt from coverage.[37] The Indemnity Agreement by its own terms is a covenant that runs with the land, and as such any damages that resulted from its violation would be exempt from coverage. However, the contract language also states that nothing in Schedule B "impair[s] the coverage afforded under Paragraphs 12, 13, 20, 21 and 23 of the Covered Risks."[38] Under Covered Risk No. 12, which is the only paragraph relevant in this case, the Silbigers are covered anytime they are "required to correct or remove an existing violation of any covenant, condition or restriction affecting the Land." Thus, the pertinent questions in this case are whether there was a violation existing before the Policy was issued, and whether the Silbigers were required to correct it.

---

[35]    Woody's Steaks, LLC v. Pastoria, 261 Ga. App. 815, 817 (2003).

[36]    Id.

[37]    Pl.'s Compl., Ex. A, at 4.

[38]    Id.

FATIC argues that the Collapse is not covered under Covered Risk No. 12 because it did not occur until many years after the Policy was issued.[39] Consequently, the Collapse is a post-policy event that is excluded under the Policy.[40] FATIC's argument, however, confuses the events. The Collapse was not the violation of the Indemnity Agreement, but rather the faulty construction. As stated above, the Vault was not constructed according to the plans that were attached to the Indemnity Agreement and that were the basis for the approval of the building permit. The risers which were supposed to allow the manhole covers to reach the surface and to allow access to the Vault for maintenance were never put in. This violation of the Indemnity Agreement existed well before the Silbigers ever bought the Property, and as a result, the Silbigers were never aware of nor able to fulfill their duties under the Indemnity Agreement.

Even if the violation pre-existed the Policy, FATIC argues that coverage should still be denied because the Silbigers were not required to repair the Vault. The City of Atlanta never said that the Silbigers would be fined if they did not repair the Vault; they only said that the Silbigers would be responsible for the consequences if they chose not to. In other words, FATIC argues that the word

---

[39]     Pl.'s Mot. for Summ. J. at 11-16.

[40]     Id.

require as used in the Policy means required by some operation of law, such as a court order or a fine by the City. This interpretation is much too narrow.

FATIC was the master of the contract and had the ability to choose the language it desired. It could have chosen stricter language such as "forced"[41] or "by Court order."[42] But FATIC only chose the word "require." Require has multiple definitions. While it certainly can mean being forced to do something by operation of law,[43] it can also mean to "feel or be under the necessity of" doing something.[44] In other words, one can be said to have been required to do something because one feels compelled by duty, community pressure, or the consequences of inaction, not just by operation of law.

"[W]hen a policy provision is susceptible to more than one meaning, even if each meaning is logical and reasonable, the provision is ambiguous and, pursuant to OCGA § 13–2–2(5), will be construed strictly against the insurer/drafter and in

---

[41]      See, 2 Title Ins. Law Appendix E, ALTA Homeowner's Policy of Title Insurance for a One-to-Four Family Residence (2016 ed.) ("You are forced to correct or remove an existing violation...").

[42]      See, Manneck v. Lawyers Title Ins. Corp., 28 Cal.App.4th 1294, 1298 (1994).

[43]      *Requirement*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Something that must be done because of a law or rule; something legally imposed, called for, or demanded; an imperative command.").

[44]      *Require*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1961).

favor of the insured."[45] As discussed above, there are multiple potential interpretations of the word require. FATIC's interpretation, however, would render the law as the only source of man's duty. This is much too narrow.

In this case, the potential consequences to the Silbigers and to their neighbors were enormous. If they had left the Vault as is and refused to repair it, they could have incurred fines from the federal government and the city, and they could have been responsible for any damage done to their neighbors' or City property. Such a situation compelled action. Therefore, because the Silbigers were required to correct the Builder's violations of the Indemnity Agreement which pre-existed the Policy, FATIC's motion for summary judgment based on Covered Risk No. 12 and the Schedule B exclusion is denied.

**B. Bad Faith Claim**

FATIC also moves for summary judgment on the Silbigers' counterclaim of bad faith denial of a valid insurance claim under O.C.G.A. § 33-4-6. Under Georgia law, "the insured bears the burden of proving that the refusal to pay the claim was made in bad faith."[46] "Georgia courts have consistently held that

---

[45]     Georgia Farm Bureau Mut. Ins. Co. v. Smith, 298 Ga. 716, 719 (2016).

[46]     S. Fire & Cas. Ins. Co. v. Northwest Georgia Bank, 209 Ga. App. 867, 867-868 (1993).

penalties for bad faith are not authorized where there is a disputed question of fact or doubtful question of law."[47] "Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact."[48] In this case, the evidence and the law show that FATIC had reasonable grounds to contest the issue of liability under the Policy. As such, FATIC's motion for summary judgment on the Silbiger's counterclaim of bad faith is granted.

## IV. Conclusion

For these reasons, the Plaintiff's Motion for Summary Judgment [Doc. 43] is GRANTED in part and DENIED in part.

SO ORDERED, this 27 day of September, 2016.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

---

[47]     Homick v. Am. Cas. Co., 209 Ga. App. 156, 156 (1993).

[48]     Fortson v. Cotton States Mut. Ins. Co., 168 Ga. App. 155, 158 (1983).